**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**

**HEARTLAND COMMUNITY BANK**                                                                                    **PLAINTIFF**

**VS.**                                    **CASE NO.  4:07CV01113 JMM**

**CITIGROUP GLOBAL MARKETS, INC.
D/B/A SMITH BARNEY**                                                                                            **DEFENDANT**

**ORDER**

Pending before the Court are defendant's Motion for Summary Judgment and plaintiff's Motion for Partial Summary Judgment. For the reasons stated below, both motions are denied (#40 and #43).

Plaintiff brings this action seeking money damages from defendant based upon three loans plaintiff made to MDH V, LLC ("MDH"). Plaintiff contends that defendant, who had possession of MDH's assets, promised to hold these assets as collateral for the loans and that defendant failed to do so. Plaintiff seeks damages based upon common law theories of promissory estoppel, fraud, and constructive fraud, and an alleged violation of the Arkansas Deceptive Trade Practices Act ("the Act").

I. *Facts*

Plaintiff is a bank with headquarters in Bryant, Arkansas. Walter Quinn, one of plaintiff's directors, owns approximately two-thirds of the stock of Heartland. Clyde Henderson is president of the bank.

Mark Singer was a financial advisor who worked in defendant's Pennsylvania office and the financial advisor to Quinn on two of Quinn's accounts. Courtney Travis was the operations manager for the office and sales assistant to Singer. Brad Adams was the branch manager of this same office.

On December 26, 2006, Singer sent an e-mail to Quinn requesting a loan for MDH which is a limited liability company whose sole owner is Mark Heisey and who was also one of Singer's clients. By affidavit, Quinn stated that Singer represented to him that Heisey and defendant would execute a guaranty agreement in plaintiff's favor in order to secure the loan. Prior to this e-mail, Quinn stated that Singer called him and told him that defendant had a good customer who was seeking a short term loan backed by a brokerage account. Quinn stated that defendant would provide a control agreement which Quinn considered to be a security agreement. Quinn also stated that he understood that defendant would execute the control agreement. Quinn told Henderson that the loan would be secured by the pledge of an account held on behalf of MDH by the defendant. The only asset in the MDH account held by defendant was an investment through Citibank's swap desk in a fund called the Topiary Fund.

On December 27, 2006, Henderson requested from Travis a copy of corporate documents relating to MDH. Henderson provided Travis with a pledge agreement used by plaintiff to secure its loan, but Travis advised Henderson that defendant would require use of its own control agreement and multi-party agreement. Defendant provided the bank with a copy of the account statement for MDH dated November 30, 2006 reflecting a balance of One Million Two Hundred Ninety-Seven Thousand Thirty One Dollars.

Also on December 27, 2006, plaintiff received a fax from Heisey with wiring instructions and signed loan documents for a $700,000.00 loan. Later in the afternoon, $700,000.00 was wired as instructed by Heisey. Travis subsequently sent a fax explaining that defendant's legal department was working on the control and multi-party agreements and that, in Travis' absence, Adams would handle the matter.

On December 29, 2006, Adams faxed plaintiff the control agreement for the pledge of the account and a multi-party agreement for Heisey's swap transaction with defendant.

Henderson stated that during their course of business, he told Travis that the agreements did not have to be signed before the loan was completed but that it ultimately had to be signed, and Travis told him that the legal department was "working on it." Henderson stated that it was implied that defendant was committed to signing the agreement.

In January 2007, plaintiff loaned MDH an additional $50,000.00. In mid-February 2007 Henderson learned from Travis that defendant's legal department would not authorize the approval of the control agreement. Henderson expressed to Travis his concern that plaintiff's loan was now unsecured and inquired as to why the legal department had failed to authorize the execution of the control agreement. Travis replied to Henderson that "legal will not authorize" but provided no additional explanation.

Defendant failed to inform plaintiff that Singer had terminated his employment with defendant on February 2, 2007 and that Singer had been under an internal investigation by defendant since September 20, 2006.

In March 2007, after plaintiff had been told that the agreements would not be signed, plaintiff loaned an additional $120,000.00 to MDH. Prior to making this loan and while aware that

the agreements had not been signed, plaintiff required Heisey on behalf of MDH to sign a letter with instructions to defendant that as soon as the MDH account received the proceeds from the redemption of its Topiary Fund, the funds would be wired to plaintiff.

MDH redeemed its Topiary Fund investment and in late April of 2007, plaintiff made inquiries of defendant as to when the funds would be wired to plaintiff. On April 26, 2007, Travis advised Henderson that the State of Tennessee had obtained a temporary restraining order against MDH's account and that the funds could not, and would not, be wired.

On May 10, 2007, defendant received an order from the Chancery Court of Shelby County, Tennessee instructing it to pay the MDH funds into the registry of the Chancery Court. On August 9, 2007 the Chancery Court of Tennessee entered an Order granting Final Judgment by Default against MDH in favor of Max Shelton, Receiver for Forrest Hill Memorial Park and Funeral Home East LLC ("receiver") in the amount of $22,136,269.13. The Court also ordered that the $1,305,497 being held in the Court's registry be tendered to the receiver.

Plaintiff received promissory notes from MDH on all three of the loans. These promissory notes were subsequently sold by plaintiff to Bancorp Holdings, LLC ("Bancorp") which is owned by Quinn. In August of 2008, Quinn rescinded the purchase of the three promissory notes.

II. *Analysis*

Plaintiff contends it is entitled to partial summary judgment as to liability on all its claims because it is undisputed that (1) defendant failed to execute the control agreement as promised and failed to release the MDH funds based upon Heisey's letter to defendant authorizing it to do so; (2) Singer was acting as defendant's agent; (3) defendant either failed to inform or concealed from plaintiff the defendant's 2006 internal investigation of Singer or that Singer's employment had

been terminated on February 2, 2007; (4) defendant protected its own interest in the MDH account by securing funds owed to defendant before honoring the Tennessee Court's orders regarding the MDH account; and (5) defendant engaged in unconscionable, false and deceptive acts and practices in its business, commerce and trade.

Defendant contends that it is entitled to summary judgment on all of plaintiff's claims because it is undisputed that (1) it never promised or committed to execute any security agreement in favor of plaintiff at any time; (2) plaintiff has not suffered any damages as it sold the three loans to Bancorp Holdings (3) the assets which plaintiff seeks were seized by order of a Tennessee state court; and (4) the Act is not applicable because plaintiff is not a consumer or, alternatively, the Act is unconstitutional.

Summary judgment is appropriate when there is no genuine issue of material fact and the dispute may be decided solely on legal grounds. *Seymour v. City of Des Moines*, 519 F.3d 790, 796 (8th Cir. 2008); Fed. R. Civ. P. 56. The initial inquiry is whether there are genuine factual issues that can be properly resolved only by a finder of fact because they may reasonably be resolved in favor of either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

Claims of fraud and promissory estoppel require, in one form or another, that a promise or representation be made. *See Southeastern Distributing Co. v. Miller Brewing Co.*, 366 Ark. 560, 575, 237 S.W.3d 63, 73-74 (2006) (elements of common-law fraud); *In re Hilyard Drilling Co., Inc.*, 840 F.2d 596 (8th Cir. 1988) (elements of promissory estoppel).

"A claim for constructive fraud, which lies when there is a confidential relationship between the parties, requires proof of all of the elements of actual fraud except scienter." *Yarborough v. DeVilbiss Air Power, Inc.* 321 F.3d 728, 730 (8th Cir. 2003) ; *see also Burgess v.*

*French*, 100 Ark.App. 51, 263 S.W.3d 578 (2007) (Arkansas Court of Appeals has "stopped short of specifically holding that all of the fraud elements must be shown to prove a constructive fraud claim, [it] pointed out that almost all cases analyze the proof using these elements.").

Based upon the affidavit and testimony of Quinn and Henderson, there is a factual dispute as to whether Singer or Travis represented that defendant would sign all necessary papers so that the loan made by plaintiff to MDH would be a secured loan and, if they made such representations, there is a factual dispute as to whether Singer was acting in his scope of employment or as an agent of defendant. Moreover, there is a dispute as to whether defendant deliberately failed to release the MDH funds to plaintiff as instructed while keeping a portion of the funds for defendant's own use or if circumstances made it impossible for defendant to release any of the funds. Based upon these genuine disputes of material facts, the cross-motions are denied.

Defendant's Motion for Summary Judgment on plaintiff's claims made under the Deceptive Trade Practices Act are denied as the Court finds that (1) the Act is meant to protect both the consumer public and the legitimate business community, *see* Ark. Code Ann. § 4-88-105(c) (Act creates Consumer Protection Division to protect legitimate business community and the general public as consumers); (2) Ark. Code Ann. § 4-88-113(f) allows cause of action for any person who suffers damages as result of deceptive, unconscionable or false act, and Ark. Code Ann. § 4-88-102(5) defines "person" as an individual, organization or corporation; and (3) the Arkansas Supreme Court has acknowledged in *Baptist Health v. Murphy*, 365 Ark. 115, 226 S.W.3d 800 (2006) the application of the Act in a nontraditional consumer situation.

Moreover, the defendant's contention that the Act is unconstitutional because it does not define the meanings of the words "deceptive," "unfair," or "unconscionable" is also without merit.

The Court agrees with the analysis in *National Federation of the Blind of Arkansas, Inc. v. Pryor*, 258 F.3d 851, 857 (8th Cir. 2005) where that Court found that the common meaning of a word can make it clear what an ordinance as a whole prohibits. *Id.* (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 110, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972)); *See also Baptist Health v. Murphy* , 365 Ark. at 811 n.6 (Court defines term of "unconscionable act" as used in the Act as one which affronts the sense of justice, decency, or reasonableness.); *State v. R & A Inv. Co.*, 336 Ark. 289, 985 S.W.2d 299 (1999) (Court finds that phrase "unconscionable, false, deceptive act or practice" as used in § 4-88-107(a)(10) is not too vague for enforcement).

III.. *Conclusion*

Based upon these disputed facts and the Court's findings related to the Act, the cross motions for summary judgment and partial summary judgment on all of plaintiff's claims are denied.

IT IS SO ORDERED THIS  9  day of   December  , 2008.

_____
James M. Moody
United States District Judge